## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAMES W. CLARK,                                )
ROSEANNE ROSEN,                           )
DANIEL DEGROOT, and                      )
KANSAS FOR CHANGE, Inc.,               )
                                                          )
                   Plaintiffs,                        )
                                                          )
v.                                                         )
                                                          )          **Case No. 19-02297-CM-ADM**
SCOTT SCHWAB, in his official capacity as  )
the Secretary of State of Kansas; and     )
RONNIE METSKER, in his official capacity )
as the Johnson County Election            )
Commissioner,                                    )
                                                          )
                   Defendants.                      )
_____)

## MEMORANDUM AND ORDER

This matter is before the court on plaintiffs' Motion for Preliminary Injunction (Doc. 3),

defendant's Motion to Dismiss for Lack of Jurisdiction (Doc. 13), and plaintiffs' Motion for Hearing

or Decision on the Existing Record (Doc. 25).

### I.      FACTUAL BACKGROUND

This case is a request for prospective relief from the enforcement of two Kansas election laws:

Kan. Stat. Ann. §§ 25-2430 and 25-2810.  Section 25-2430 ("the electioneering statute") provides, in

relevant part:

> (a) Electioneering is knowingly attempting to persuade or influence eligible voters to
> vote for or against a particular candidate, party or question submitted. Electioneering
> includes wearing, exhibiting or distributing labels, signs, posters, stickers or other
> materials that clearly identify a candidate in the election or clearly indicate support or
> opposition to a question submitted election within any polling place on election day or
> advance voting site during the time period allowed by law for casting a ballot by
> advance voting or within a radius of 250 feet from the entrance thereof. Electioneering

shall not include bumper stickers affixed to a motor vehicle that is used to transport voters to a polling place or to an advance voting site for the purpose of voting. . . .

(c) Electioneering is a class C misdemeanor.

*Id.* Section 25-2810 ("the control statute") provides, in relevant part:

(a) Each election board shall have control of its voting place and election procedure under the sole supervision of the secretary of state, county election officer, deputy county election officers and the supervising judge. . . .

(h)(2) The secretary of state may adopt rules and regulations to implement the provisions of this section.

*Id.* § 25-2810.  Plaintiffs' challenges can be divided into (1) prosecution-based challenges pursuant to the electioneering statute, and (2) discretion-based challenges pursuant to the control statute.  The only relevant defendant at this time is defendant Scott Schwab, in his official capacity as the Secretary of State of Kansas.[1]  Both the ability and willingness of defendant Schwab to take enforcement action under the above statutes are strongly contested.

Plaintiffs are James W. Clark, Roseanne Rosen, Kansas for Change, Inc., and Daniel DeGroot. Defendants at the time of filing were Scott Schwab, in his official capacity as the Secretary of State of Kansas; and Ronnie Metsker, in his official capacity as the Johnson County Election Commissioner. Only defendant Schwab is relevant for the court's evaluation of plaintiffs' Motion for Preliminary Injunction and defendant's Motion to Dismiss.

Plaintiffs allege that the electioneering statute is geographically overbroad and that the control statute leads to chilling of speech.  All plaintiffs except for Kansas for Change state that they fear arrest or criminal prosecution under an election official's prospective application of the electioneering statute.  (Doc. 1, at 2–3.)  Kansas for Change states that it "would like to continue running petition

---

[1] The court granted defendant Metsker and plaintiffs' joint motion to withdraw plaintiffs' motion for a preliminary injunction against defendant Metsker only.  (Doc. 22.)

drives at polling places but is chilled from doing so under the Secretary of State's policy granting Sedgwick County election judges unfettered discretion pursuant to [the control statute]."  (*Id.* at 3–4.)

Plaintiff Clark states that he fears arrest and prosecution pursuant to the electioneering statute. He states that he "engaged in non-electioneering speech within [the buffer zone] and was improperly censored by a county election official under the state's policy of unfettered discretion," and he fears arrest and prosecution pursuant to the electioneering statute.  (*Id.* at 3, 5.)[2]

Plaintiff Rosen alleges both fears of censorship and criminal penalties under the electioneering statute.  (*Id.*)  She states that she "engaged in non-electioneering speech on private property [within the buffer zone] and was ejected by Defendant Metsker pursuant to his application of [the electioneering statute]."  (*Id.* at 5.)[3]

Plaintiff Kansas for Change states that its members "have been asked to leave polling locations because election judges determined that their non-electioneering activities would still be prohibited."  (*Id.* at 6.)[4]  Plaintiff would like to continue its election day petitioning and engagement efforts to support marijuana decriminalization within the electioneering buffer zone, but "fear [its members] will be subject to exclusion and arrest under the Secretary of State's application of [the control statute]."  (*Id.*)

Plaintiff DeGroot has engaged in and wishes to continue in similar decriminalization advocacy on election day within the electioneering buffer zone.  (*Id.*)  Plaintiff previously volunteered to collect signatures, and upon arriving for his shift "was informed that his fellow volunteers had been accused

---

[2] Plaintiff Clark declares that this alleged censorship was pursuant to a poll worker's determination that Clark's nonpartisan activity "was electioneering."  (Doc. 4-4, at 3.)  When Clark objected that he was not electioneering, the poll worker told him to "take that up with someone else, [and that] she was required to order [Clark] off the premises."  (*Id.*)

[3] Plaintiff Rosen was asked to leave the buffer zone after election workers in Johnson County called their supervisor (defendant Metsker) and confirmed that Rosen's nonpartisan activity was considered "electioneering."  (Doc. 4-7, at 2–3.)

[4] Members of Kansas for Change have been removed from polling locations based on "accusations that handing out informational material on marijuana-related policy was causing a disturbance to voters," and at least once by an election judge without clear reference to the electioneering statute.  (Doc. 4-6, at 2–3.)  It is uncertain whether these actions were taken pursuant to the control statute or in misapplication of the electioneering statute.

of violating the electioneering statute by the election judge and that police were called to the scene." (*Id.*)  Plaintiff "is hesitant because he does not want to be arrested for electioneering or ejected from the polling location by an election judge exercising their discretion under [the control statute]."  (*Id.* at 7.)[5]

In sum, the facts for all plaintiffs are generally similar: (1) plaintiffs engaged in or sought to engage in non-electioneering speech within electioneering buffer zone (whether election protection efforts or marijuana decriminalization efforts); (2) plaintiffs were informed that their non-electioneering speech could not occur within the buffer zone, either due to a misapplication of the electioneering statute or due to an application of the control statute; and (3) plaintiffs would like to continue their advocacy within the buffer zone on election day, but fear adverse consequences. Plaintiffs Clark and Kansas for Change add that they also wish to engage in partisan speech within the buffer zone on election day; Clark "on private and public property" (*Id.* at 15) and Kansas for Change "on public property near polling locations" (*Id.* at 16). [6]  Both Clark and Kansas for Change fear arrest (individually or for its members) if they engage in partisan speech within the buffer zone.  (*See id.* at 3, 17).

While the factual content of both parties' cited authority is generally not contested, the context and meaning of that content and its resulting legal sufficiency are strongly disputed.  The court will summarize and address plaintiffs' relevant authority to either their electioneering and control challenges within each challenge's analysis below.

---

[5] Plaintiff DeGroot declares that volunteers were prohibited from collecting signatures pursuant to the electioneering statute and that he fears future misapplied enforcement of the electioneering buffer zone.  (Doc. 4-5, at 2–3.)

[6] "Partisan speech" becomes "electioneering" when it is both (1) "knowingly attempting to persuade or influence eligible voters to vote for or against a particular [candidate or measure on the ballot]," *and* (2) "within any polling place . . . or within a radius of 250 feet from the entrance thereof."  Kan. Stat. Ann. § 25-2430.

## II.   LEGAL STANDARD

The instant case is before the court on plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss for lack of subject matter jurisdiction.  Defendant Schwab moves to dismiss for both Eleventh Amendment immunity and lack of standing.

### A.  Subject Matter Jurisdiction

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) generally takes one of two forms: either a facial challenge or a factual challenge.  *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)).  *Id.*  A facial attack challenges the allegations in the complaint regarding subject matter jurisdiction.  *Id.*  In reviewing a facial attack, the court must accept the complaint's allegations as true.  A factual attack "go[es] beyond allegations contained in the complaint and challenge[s] the facts upon which subject matter jurisdiction is based." *Id.*  In reviewing a factual attack, the court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve jurisdictional facts."  *Id.* (citation omitted).  The court's reference to evidence outside the pleadings does not convert a Rule 12(b)(1) motion into one for summary judgment unless the jurisdictional question is intertwined with the merits.  *Id.*; *see Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1897).  Defendant Schwab offers extra-pleading material in support of his motion and the jurisdictional issues raised are not intertwined with the merits of this case, so the court will consider materials outside the pleadings.

## III.   DISCUSSION

### A.  Eleventh Amendment

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state."  *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009).  An official-capacity suit is treated as a suit against

the state entity, and "[t]he type of relief sought by a plaintiff suing a State in court is irrelevant to the question whether a suit is barred by the Eleventh Amendment." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 745 (2002); *see Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013). Although the *effect* of this immunity does not change, there is an exception to its *application* when a plaintiff seeks prospective relief against alleged ongoing violations of federal law. *Peterson*, 707 F.3d at 1205 (citing *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011)); *see Ex parte Young*, 209 U.S. 123, 157 (1908).

The *Ex parte Young* exception requires "that [the] officer must have some connection with the enforcement of the act," rather than merely functioning to make the state a party. *Ex parte Young*, 209 U.S. at 157. The Tenth Circuit has clarified that "[d]efendants are not required to have a 'special connection' to the unconstitutional act or conduct. Rather, state officials must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Peterson*, 707 F.3d at 1205 (quoting *Prarie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)). The parties dispute both whether defendant Schwab has a willingness to enforce the electioneering statute, and whether he has either a duty or a willingness to enforce the control statute. To resolve these disputes, the court must address the type of conduct that shows enforcement of a challenged duty and the circumstances that show a willingness to exercise that enforcement.

1. *Ex parte Young*: Connection and Willingness to Exercise Enforcement Duty

An official's "[c]onnection to the enforcement of an act may come by way of another state law, an administrative delegation, or a demonstrated practice of enforcing a provision." *Id.* at 1207. Multiple Tenth Circuit decisions provide guidance on which connections to enforcement will show a particular duty and willingness to exercise enforcement powers outside of traditional prosecution.

Decisions from this District and the Sixth and Eighth Circuits provide further guidance in the context of election law.

Kitchen v. Herbert shows that the court will not ignore an official defendant's stated intent and ability to use other state laws to engage in unlawful enforcement.  755 F.3d 1193 (10th Cir. 2014). Wagnon, Cressman v. Thompson, and Russell v. Lundergan-Grimes each demonstrate how an official defendant shows a willingness to exercise enforcement duties through administrative provisions. Russell, 784 F.3d 1037 (6th Cir. 2015); Cressman, 719 F.3d 1139 (10th Cir. 2013); Wagnon, 476 F.3d 818.  Fish v. Kobach and Missouri Protection & Advocacy Services, Inc. v. Carnahan further show the ways that an official may be made to defend based on a demonstrated practice of enforcing a provision. Fish, 189 F. Supp. 3d 1107 (D. Kan. 2016); Carnahan, 499 F.3d 803 (8th Cir. 2007).

In Wagnon, the Tenth Circuit found state officials to be proper defendants under Ex parte Young based on the officials' exercise of administrative power.  A federally recognized Kansas Indian tribe sued the state's Secretary of Revenue, Director of Vehicles, and Superintendent of the Highway Patrol, seeking to enjoin the state's practice of refusing to recognize the Nation's vehicle registrations and titles outside the Reservation.  476 F.3d at 820.  The court rejected defendants' Eleventh Amendment arguments because the "Director of Vehicles, manages vehicle registrations and titles and supervises vehicle reciprocity; [and] the Secretary of Revenue[] is the State official—in connection with the [Director of Vehicles]—who decided to deny the validity of the Tribe's registrations; and . . . [the] Superintendent of the Kansas Highway Patrol[] enforces traffic and other laws of the state related to highways, vehicles, and drivers of vehicles."  Id. at 828.  Together, these decisions by the Director and Secretary first used administrative power to alter the legal status of plaintiffs on Kansas roads, and the Superintendent's Highway Patrol next took traditional enforcement action based on that status.  See id.  This set of administrative actions: first, altering the validity of prospective enforcement, and

second, engaging in traditional enforcement, gave meaningful effect to the challenged statutes.  *See id.* & n.15.

In contrast, *Cressman* illustrates that not all administrative actions show enforcement.  In a First Amendment challenge to religious art on Oklahoma license plates, the court found that a clerk's authority to interpret the relevant licensing statute was insufficient enforcement power to bring her within the *Ex parte Young* exception.  *See Cressman*, 719 F.3d at 1146 & n.8 (noting enforcement duty as part of both standing and immunity).  However, the court allowed the suit to proceed against multiple Tax Commission officials, as the administering body for the state's Motor Vehicle Division. Rejecting the challenge to the clerk, the court stated, "the authority to interpret and administer a statute is not the same as the authority to *enforce* a statute."  *Id.*[7]

*Kitchen* similarly demonstrates that an official's un-exercised statutory powers may still show a willingness to exercise enforcement.  *See* 755 F.3d at 1202–03.  The *Kitchen* defendants, the Governor and Attorney General of Utah, had "explicitly taken the position . . . that they ha[d] ample authority to ensure that the Salt Lake County Clerk return[ed] to her former practice of limiting marriage licenses to man-woman couples in compliance with [the challenged] Utah law."  *Id.* at 1202.  The law in question, Utah's Amendment 3, limited the definition of "marriage" to man-woman couples.  *Id.* at 1200.  Faced with this clear official intent, the court took notice of both defendants' statutory power to commence enforcement proceedings against clerks violating Amendment 3 and defendants' coordination of agency action pending review of the district court's injunction, finding "that the Governor's and the Attorney General's actual exercise of supervisory power and their authority to

---

[7] The *Cressman* court favored the Ninth Circuit's construction of the relationship between the duty requirement of *Ex parte Young* and the causation element of standing, expressed in *Planned Parenthood of Idaho, Inc. v. Wasden*.  376 F.3d 908, 919 (9th Cir. 2004).  The *Wasden* court's analysis further recognizes that "Th[e] connection [under *Ex parte Young*] must be fairly direct; a generalized duty to enforce state law or a general supervisory power over persons responsible for enforcing the challenged provision will not subject an official to suit."  *Id.* (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

compel compliance from county clerks and other officials provide the requisite nexus between them and [the Amendment]."  *Id.* at 1203–04.[8]

Turning specifically to election law cases, our District's decision in *Fish* and the Eighth Circuit's decision in *Carnahan* show when ongoing violations will satisfy a willingness to enforce regardless of official intent.  The Sixth Circuit's decision in *Russell* suggests circumstances where the Tenth Circuit's approach in *Wagnon* may be extended beyond the creation of new enforcement.

In *Fish*, a voting rights challenge to a Kansas law requiring motor-voter applicants to present documentary proof of citizenship (DPOC), the court determined that the state's Secretary of Revenue could be required to defend despite his disavowal of either ability or intent to disqualify pending voter registrations.  *See* 189 F. Supp. 3d at 1125–26.  While the court recognized the Secretary's lack of express enforcement power, his agency's ongoing gathering and transmission of information necessary to disqualify registrants showed sufficient willingness to facilitate enforcement of the DPOC requirement.  *See id.* at 1126.

In *Russell*, a similar electioneering challenge to the instant case, the Sixth Circuit found that Kentucky's Secretary of State had a duty to administer state election laws and provide training to state and local personnel, as well as the power to adopt regulations to carry out those duties.  *See* 784 F.3d at 1047–49.  The court noted that "KSBE—of which Secretary Grimes is the chair—is busily engaged in administering Kentucky's election laws, including [Kentucky's electioneering provision]."  *Id.* at 1048. The court identified that "KSBE *acted* when it promulgated [a state regulation] authorizing an exemption to [Kentucky's electioneering statute] for bumper stickers on cars while voting."  *Id.*  While Kentucky's Secretary of State had not created the sort of new liability faced by the Tenth Circuit in

---

[8] *See Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986) (allowing suit based on supervisory power "[t]o the extent that the respondent Secretary of State is acting in a manner that violates the Equal Protection Clause . . . ."); *Kitchen*, 755 F.3d at 1204 (citing *Papasan*, 478 U.S. at 282 n.14).  While plaintiffs suggest that the Tenth Circuit's reference to *Papasan* would allow a suit based solely on supervisory power, the court is not persuaded that the Tenth Circuit removed the requirement for unlawful action two sentences after making conclusions on that exact point as to the *Kitchen* defendants.

*Wagnon*, the Sixth Circuit was persuaded that the Secretary's prior use of administrative power to define conduct as "not electioneering" showed sufficient willingness to exercise that enforcement power.  *See* Ky. Rev. Stat. Ann. § 117.235(3)(c) ("Electioneering . . . shall not include . . . exceptions established by the State Board of Elections through the promulgation of administrative regulations.").

Finally, in *Carnahan*, the Eighth Circuit determined that Missouri's Secretary of State was not immune to a suit seeking to enjoin the state's refusal of voter registration to persons under guardianship.  Missouri law made the Secretary "responsible for overseeing the [challenged] voter registration process," and the Secretary's continued involvement in that process made him an appropriate defendant.  *Carnahan*, 499 F.3d at 807.[9]

### 2. The Electioneering Statute

Plaintiffs argue that Secretary Schwab's willingness to exercise his enforcement duties is met through his various statutory enforcement powers, administrative guidance, and prior statements and actions by his Office.  Plaintiffs identify prior prosecutions under the electioneering statute; testimony by Secretary Schwab's Office in favor of recent legislation; the continued availability of an online election crime reporting form and hotline; and both an interpretive guidance e-mail and new Election Manual promulgated after this case's filing.  The court will summarize the relevant facts for each theory before turning to the sufficiency of plaintiffs' showing.

### i. *Statutory Power, Prior Prosecutions, and Legislative Testimony*

The electioneering statute may be enforced by the Secretary of State, the Kansas Attorney General, or the District Attorney or County Attorney where the electioneering took place.  Kan. Stat. Ann. § 25-2435(a).  This jurisdiction is not shared; whichever office files first takes individual jurisdiction over the matter, and subsequent filing by the other two offices is not permitted.  *Id.* § 25-

---

[9] The court recognizes that *Carnahan* also discussed the Missouri Secretary of State's status as "chief state election official."  499 F.3d at 807.  This status was relevant to the registration-based challenge in *Carnahan*, but it is not used for the instant challenges under Kansas law.  *See id.* at 812 (discussing challenges under ADA and federal voting rights laws).

2435(b).  The Secretary of State's Office did not have authority to prosecute election crimes prior to the tenure of Secretary Kobach.[10]  Recent, though unsuccessful, amendments have sought to restore the former status quo by removing this power from the Secretary of State's office and have been supported by both Secretary Schawb and Attorney General Derek Schmidt.[11]  The state Attorney General's Office has testified that it now has an enforcement group more suited to the prosecution of election crimes without diverting resources from other departments.[12]  While the Secretary of State's Office retains the authority to prosecute election crimes today, the Office has testified that it is focused on administering its constitutional duties rather than prosecuting election crimes, and Secretary Schwab does not intend to pursue criminal matters.  *See Koupal Testimony*.

According to filings cited by plaintiffs, the Secretary of State's Office has referred an electioneering matter for prosecution twice in the past 15 years.[13]  The two instances are: (1) a prosecution and conviction for electioneering in Clark County in 2004, and (2) a referral of an electioneering matter to the district attorney in Sedgwick County in 2006.  *Election Crime Data*, at 1, 4.  Plaintiffs misstate that this second referral occurred in 2010 (Doc. 1, at 8–9), likely due to a misreading.  *Election Crime Data*, at 4 (showing a 2010 referral for a double vote and a 2006 referral for electioneering).  It is not clear whether the Secretary of State's Office has caused electioneering to be prosecuted in at least 14 years, or whether the Office has referred an electioneering matter for prosecution in at least 12 years.  It is similarly unclear from plaintiffs' cited data whether the Office has ever prosecuted electioneering except by referral to another authority.

---

[10] *See* 2015 Kansas Laws Ch. 87 § 2 (S.B. 34) (effective July 1, 2015 and codified at Kan. Stat. Ann. § 25-2435).
[11] *See* Written Testimony of Deputy Assistant Secretary of State Katie Koupal on HB 2042 before H. Comm. on Corr. & Juv. Justice (Kan. 2019), *available at* http://www.kslegislature.org/li/b2019_20/committees/ctte_h_corr_juv_jus_1/documents/testimony/20190128_04.pdf (testifying in support only of removing prosecutorial power) ("*Koupal Testimony*").
[12] *See* Testimony of Kansas Attorney General Derek Schmidt on HB 2042 before H. Comm. on Corr. & Juv. Justice (Kan. 2019), *available at* http://www.kslegislature.org/li/b2019_20/committees/ctte_h_corr_juv_jus_1/documents/testimony/20190128_01.pdf.
[13] Known Reported Incidents of Election Crimes at 1, 4, *Fish v. Kobach*, No. 16-02105-JAR (D. Kan. Dec. 22, 2016), ECF No. 269-32 ("*Election Crime Data*").

*ii. Hotline and Online Reporting System*

Plaintiffs argue that defendant Schwab maintains a hotline and online complaint system to solicit information about election crimes.  The page, entitled "STOP VOTER FRAUD," is available through a link in a list of voter responsibilities, which include "Report[ing] illegal activities such as electioneering [and several other election crimes] to the precinct election board, the county election officer, or the Secretary of State,"[14] and states:

> If you witness suspicious activity related to an election, please report it by filling out the Stop Voter Fraud form at the link below.  Your information will be forwarded directly to the Kansas Secretary of State's Elections Division.  Or call our Stop Voter Fraud hotline . . . . An elections investigator may contact you for additional information.

(Doc. 19-3 ("Stop Voter Fraud" launch page).)  A link at the bottom of the page opens an electronic form for an "Incident Report" which categorizes incidents as one of ten election crimes, or "Other." (Doc. 19-4 (reproducing the report).)  "Electioneering" is not a named incident option.  (*See id.*)  The form's signature line refers to itself as an "investigation request form"[15] and requires the submitter to electronically sign, "verify[ing] under penalty of perjury that the foregoing information is true and correct to the best of [the submitter's] knowledge."  (*Id.* at 4.)  In light of the data cited by plaintiffs, it is not clear whether the form or the hotline have been used to report electioneering or have led to a prosecution referral in the past 12 years.  *See Election Crime Data*, at 1–4.

*iii. Guidance and New Manual*

The Kansas Election Standards Manual (the "Manual"), available online, is one component of the instruction provided by the Secretary of State's Office to county election officers.  *See* Kan. Stat.

---

[14] *What are my rights and responsibilities?*, KAN. SEC'Y OF STATE, (http://www.voteks.org/when-you-vote/rights-and-responsibilities.html).

[15] Although the form characterizes itself as an investigation request, Secretary Schwab's Declaration states that "[t]he Kansas Secretary of State Office . . . has not budgeted the funds necessary to make inquiries and collect information in order to determine whether election crimes have been committed."  (Doc. 14-1, at 2–3.)

Ann. § 25-124.  After the filing of this action, Secretary Schwab's office replaced the 2014 Manual (Doc. 1-1) by promulgating the 2019 Manual (Doc. 19-2), and electronically notified officials that the Office was adopting a recent opinion of the state Attorney General's Office (Doc. 18-1, at 4).  The opinion clarifies that the electioneering statute does not apply to non-partisan activity and the new Manual recommends that officials read the opinion for training.  Plaintiffs argue that because Secretary Schwab's office has not removed the Manual's references to electioneering, his instruction shows that he is willing to exercise enforcement of the electioneering statute.

The new Manual refers to electioneering in six places, but only twice in relation to the duties of election boards.  These two references, retained from the 2014 Manual, inform election officers that the prevention of electioneering is part of "preserv[ing] the ability of voters to receive their ballots and cast them in secrecy" (Doc. 19-2, at 27), and "prevent[ing] illegal activities" (*Id.* at 40), as required by law.  Both sets of instruction refer to the recently-adopted Attorney General's opinion.  (*See id.* at 27, 40.)  The remaining mentions of the statute are part of the duties of voters, poll agents, and visitors, and a general table of election crimes in Kansas.

The guidance notice was sent by Mr. Caskey to the "county-election-officials" listserv on July 17, 2019, signed by him as "Director of Elections," and provides:

> The Secretary of State's office is informing all county election offices of its interpretation concerning electioneering as defined by [the electioneering statute].  In 2018, the Kansas Attorney General's office issued Attorney General Opinion 2018-15 concerning activities that could be considered electioneering.  The Secretary of State's office has reviewed the opinion, and accepts and agrees with its interpretation.  Attached is a copy of the opinion for your review.  Consult your county attorney for questions or additional interpretation.

(Doc. 18-1, at 4.)  The attached Attorney General's opinion offers an interpretation of the electioneering statute, stating that the "mere presence of a person offering non-partisan voter assistance, or signage advertising the same, within [the electioneering buffer zone] does not constitute

electioneering [in the absence of other prohibited conduct].” (*Id.* at 5.) The opinion further explains that whether individuals purporting to offer non-partisan assistance and advocacy are actually engaged in electioneering depends on the facts of each individual case. (*Id.*) The opinion finally notes that the control statute empowers each election board to control its respective polling place but disclaims that “[t]he extent to which the state or a local election board may restrict non-partisan speech in or around a polling place is beyond the scope of this opinion.” (*Id.* at 8 n.1 (noting that under *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018), content-based restrictions on speech inside a polling place must be reasonable and viewpoint-neutral).)

### iv. Recent Policies: Non-Prosecution and Adoption of Attorney General's Opinion

Defendant Schwab argues that plaintiffs cannot show a willingness by his Office to enforce the electioneering statute. In particular, defendant declares:

> As Kansas Secretary of State, I have made the decision that I will not prosecute election crimes. Further, employees at the Kansas Secretary of State's Office, all of which are subject to my control and direction, will not prosecute election crimes.
> In particular, I and the employees at the Kansas Secretary of State's Office will not prosecute the plaintiffs named in the above-captioned lawsuit for committing or attempting to commit the electioneering prohibited by [the electioneering statute].

(Doc. 14-1, at 2.) Defendant further accepts and approves the state Attorney General's interpretation of the electioneering statute and disavows any prior inconsistent interpretations as no longer representing the views of the Office. (*Id.* at 4.)

### v. Conclusions

Here, Secretary Schwab lacks a demonstrated willingness to exercise enforcement powers. Although Secretary Schwab's Office has promulgated limited instruction concerning the electioneering statute and has maintained an existing reporting mechanism for election crimes, this involvement does not overcome either his declaration that his Office will not prosecute election crimes, or his Office's lack of meaningful enforcement conduct to the contrary.

First, while *Wagnon* considers that an official may be forced to defend based on administrative enforcement, Secretary Schwab has neither threatened nor taken an action that alters the validity of enforcement against plaintiffs, nor has he attempted to actually enforce Kansas election crime laws against plaintiffs.  In fact, the opposite has occurred: Secretary Schwab has declared that he and his Office will not prosecute election crimes, he has further declared that he will not prosecute plaintiffs for electioneering, and he has advocated for the removal of his Office's traditional enforcement power.  Although Secretary Schwab has adopted a recent Attorney General's opinion clarifying that some of plaintiff's non-partisan advocacy is not electioneering, and this adoption may reduce future *misapplication* of the electioneering statute, it critically does not alter the validity of past or future enforcement in the way that both the *Wagnon* and *Russell* courts found sufficient to show a willingness to exercise enforcement powers.

Second, while *Kitchen* mentions supervisory power in its Eleventh Amendment analysis, the court was faced by circumstances opposite those present here.  The *Kitchen* defendants clearly expressed an intent to enforce the challenged laws and to use their various statutory supervisory powers in pursuit of that enforcement.  Secretary Schwab has taken the position that he will not use his Office's power to prosecute election crimes, his Office's only significant change in instruction operates to reduce erroneous enforcement, and no materials cited by plaintiffs support a clear intent to the contrary.  While the court recognizes that at least one prior Kansas Secretary of State has referred electioneering matters for prosecution, and that some prior official conduct may be imputed to present officials, the court is not persuaded that these few referrals—over twelve years ago—are sufficient to overcome Secretary Schwab's present declaration of intent to not prosecute election crimes.

Third, while *Fish* and *Carnahan* show that officials may be required to defend an election matter based on the continued enablement of a violation, there is no similar suggestion here that

-15-

Secretary Schwab is creating a condition precedent to electioneering enforcement.  *Fish*, consistent with *Wagnon*, found that the Kansas Secretary of Revenue could be made to defend based on his office's critical role enabling plaintiffs' injuries.  The DMV, overseen by the defendant's Office, provided the threshold information required to deny a federal voting right.  By preventing the forwarding of this information, the Secretary of State's Office then lacked the information necessary to enable the challenged DPOC program.  *Carnahan* is similarly inapposite because the defendant Secretary of State was continuously involved in the challenged registration process.  The fact that *Carnahan* involved a Secretary of State—or any top-level election official—as a defendant does not show a conduct-based similarity to the instant immunity analysis.[16]  The injuries alleged by plaintiffs are neither inherently enabled by nor created by an enforcement action of Secretary Schwab.  While the Secretary may include some interpretation of Kansas election crime laws in the Election Manual's instructive materials, this instruction does not create or alter the validity or possibility of ongoing enforcement.  Similarly, the maintenance of instruction materials which make reference to electioneering does not show a willingness to enforce the state's criminal electioneering law in spite of Secretary Schwab's many clear statements to the contrary.

Finally, *Russell* is illustrative of both the kind of prior administrative enforcement that will satisfy *Ex parte Young*, and that unique differences in state law and official powers should be addressed, not discounted.  Kentucky law gives its Secretary of State—acting through the state's election board—the administrative power to define conduct as "not electioneering."  This is the application of *Wagnon* by the opposite direction: an exercise of power that makes an individual *not* subject to enforcement similarly shows a willingness to use that power.  Plaintiffs neither mention nor

---

[16] Plaintiffs suggest that other courts have found a Secretary of State to be a proper defendant for electioneering challenges. *See Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988); *Nat'l Broad. Co. v. Cleland*, 697 F. Supp. 1204 (N.D. Ga. 1988).  While both opinions perform significant First Amendment analysis, there is no indication that either court addressed Eleventh Amendment immunity.  The court's inquiry must address the defendant's power and willingness to exercise that power, not just defendant's title.

explain why the court should ignore the differences in official power between *Russell* and the instant

case, and do not address whether the *Russell* court's assumptions about the defendant's instructional

powers should be persuasive here in light of the Tenth Circuit's guidance in *Cressman*.  While the new

Election Manual does refer to the Attorney General's opinion for conduct not covered by

electioneering, both that opinion and the statute's plain text are clear that this conduct was never

"electioneering" under Kansas law.  Accordingly, the guidance is informative rather than a change in

the validity of enforcement, and not the exercise of administrative power before both the *Wagnon* and

*Russell* courts.

While Secretary Schwab's Office is involved with the administration of multiple provisions of

Kansas election law, plaintiffs have not shown that Secretary Schwab is willing to enforce the Kansas

criminal law against electioneering through either administrative power, another state law, or a

demonstrated practice of enforcement.  This showing requires something more than the few mentions

of electioneering in the Election Manual's instruction, the continued existence of reporting

mechanisms unsupported by a showing of their use, and the Secretary's advocacy in favor of removing

his Office's prosecutorial power.  Although additional actions by Secretary Schwab or his Office may

show a willingness to enforce the electioneering statute, the actions currently before the court do not.

Because plaintiffs have not shown that Secretary Schwab has a willingness to enforce the

electioneering statute, the *Ex parte Young* exception is not satisfied and Secretary Schwab is immune

to plaintiffs' electioneering claims.

### 3. The Control Statute

With respect to the control statute, plaintiffs allege that defendant Schwab maintains an official

policy, expressed in the Election Manual, allowing election officials unfettered discretion in their

"control" of each of their respective polling places.  Plaintiffs further allege that this policy in turn

empowers local election officers to adopt policies that unconstitutionally restrict speech in violation of the First Amendment.  In this way, plaintiffs argue that Secretary Schwab both uses statutory or administrative power to create an unlawful enforcement policy and continues a practice of unlawful enforcement by maintaining this policy.  Defendant argues that this alleged policy is a function of the control statute and that his Office maintains no such policy; that the Election Manual's examples of other officers' past policies are neither his Office's policies nor directive; and that he has no power to create or control these allegedly injurious individual officers' policies.

### *i. Alleged Policy and Source*

Plaintiffs allege that Secretary Schwab "maintains an official policy of granting election officials unfettered discretion to restrict any speech or assembly activity within [the electioneering buffer zone] if they forecast that the activity could become a nuisance."  (Doc. 1, at 2.)  Plaintiffs base this allegation on the 2014 version of the Kansas Election Standards Manual.  The 2014 Manual's section on "Election Board Authority" provides:

> Some CEOs[17] have adopted policies prohibiting cell phones, cameras, video cameras or Bluetooth devices in polling places.  These items may be prohibited to protect voters' ability to vote without intimidation or distraction, to prevent discussions about ballot measures, and to prevent wireless communications which may allegedly interfere with the operation of electronic voting equipment.  *Some CEOs also have adopted policies prohibiting the distribution of printed materials at the polling place or within 250 feet of the entrance.  Even if the printed materials are not related to any candidate or issue on the ballot, their distribution may be prohibited to avoid situations that may be nuisances or distractions for voters.  Examples include the distribution of religious pamphlets at polling places held in churches.*
>
> *This type of policy is consistent with the statutory responsibility of election boards*: "Each election board shall have the control of its voting place and election procedure under the sole supervision of the secretary of state, county election officer, deputy county election officer and the supervising judge."  [KSA 25-2810(a)]

---

[17] County election officers

(Doc. 1-1, at 41–42 (emphasis and footnote added, citations in original).)[18]  Plaintiffs specifically point to the second paragraph's introductory statement as either evidence of defendant Schwab's alleged official policy, or as the policy itself.

### ii. Statutory Powers

Pursuant to the control statute, the Secretary of State has authority to adopt implementing rules and regulations.  Kan. Stat. Ann. § 25-2810(h)(2).  While the court uses "the control statute" to denote Section 25-2810, the statute also deals with procedures for (1) the counting and timing of counting ballots; (2) certification of election results by election workers on duty; (3) allocation of election staffing resources; and several other aspects of general election management.  *See id.* § 25-2810(b)–(h)(1).  The challenged "control" scope is one aspect of the statute's nine subparts.  *See id.* § 25-2810.

The Secretary of State's Office has exercised its regulatory authority pursuant to the control statute only once, in 2008.  *See* Kan. Admin. Regs. 7-45-1.  This regulation, "Modified shifts for election board workers," creates requirements to be used when a county election official wishes "to allow the election board workers at a specified polling place to work at the polling place for less than the entire number of hours designated as polling hours[.]"  *Id.*  The regulation makes no mention of external polling place management, control, or the handling of individuals other than election board workers.  *See id.*  While a previous Office promulgated a rule including language that "[t]he election board workers shall ensure that *the poll agents* do not engage in . . . electioneering," this rule was implemented through Section 25-3005, not the control statute.  *See* Kan. Admin. Regs. 7-45-2 (emphasis added).  Furthermore, Section 25-3005 mandates: "At all elections authorized poll agents *shall be allowed to be present . . . subject to such limitations as are prescribed by law* or rules and

---

[18] The corresponding "Election Board Authority" section in the 2019 version of the Manual is identical until the twelve introductory words of the third paragraph, where "This type of policy is consistent with the statutory responsibility of election boards:" is replaced with "Pursuant to statute," and the statute's "Each" is changed to lower-case.  (*Compare* Doc. 1-1, at 41–42, *with* Doc. 19-2, at 39–40.)

regulations of the secretary of state."  Kan. Stat. Ann. § 25-3005 (emphasis added).  Electioneering was and is prescribed by law, the regulation's prohibition was not discretionary.  *See id.* § 25-3420.[19]

Defendant's remaining powers are less direct.  First, "election commissioner[s], in the conduct of elections, shall operate under the general supervision of the secretary of state and shall comply with the statutes, rules and regulations and standards and directives that relate to the registration of voters and the conduct of elections."  *Id.* § 19-3424.  Second, "[c]ounty election officers . . . shall receive instruction relating to their duties in conducting official elections," and "[t]he form and content of the instruction shall be determined by the secretary of state." *Id.* § 25-124.

### iii. Guidance, the Manual, and Changed Practices

Secretary Schwab has issued guidance or instruction in two ways relevant to plaintiffs' challenge under the control statute: first, by issuing the 2019 Manual, and second, by adopting the Attorney General's opinion addressing non-partisan election advocacy.  While the 2014 Manual has been replaced by the 2019 Manual, the relevant content plaintiffs challenge is substantively unchanged.[20]

The 2019 Manual refers to the control statute in four places.  (*See* Doc. 19-2, at 27, 35, 40, 65.)  In each case, the statute is used in the context of either (1) election officials' duty to prevent unauthorized access to ballots and other illegal activities, or (2) procedure requiring that voters refrain from illegal activities and disorderly election conduct.  (*See id.*)

The Attorney General's opinion, adopted through an e-mail to county election officials, provides some discussion of the control statute.  After interpreting the electioneering statute, the opinion finds that the control statute does not define an election board's "control" over "its voting place and election procedure," and concludes:

---

[19] (*See also* Doc. 19-2, at 63 ("Poll agents . . . are subject to the same statutes prohibiting electioneering, voter intimidation and disorderly conduct as anyone else").)
[20] (*Compare* Doc. 1-1, at 41–42, *with* Doc. 19-2, at 39–40.)

[T]he election board of each polling place is authorized to guide, manage, direct, and oversee the polling place to ensure that voting is conducted in an orderly manner.  The extent to which a state or local election board may restrict non-partisan speech in or around a polling place is beyond the scope of this opinion.

(Doc. 18-1, at 8.)  The opinion assumes that a polling place "is considered a nonpublic forum within which reasonable restrictions on speech are allowed," and notes that content-based restrictions on speech must be reasonable and viewpoint neutral.  (*See id.* & n.1 (citing *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1879–80 (2018))).

Defendant Metsker, Election Commissioner for Johnson County, has declared that "[p]ursuant to [Section] 19-3424, he accepts and will abide by Secretary Schwab's recent determination as set forth in the [Secretary's Declaration and] email regarding non-partisan voter assistance or signage advertising such assistance within the 250-foot non-electioneering buffer zone established by [the electioneering statute]."  (*Id.* at 2–3.)  Defendant Metsker continues that "[t]o the extent that [his] prior practice . . . regarding the 250-foot non-electioneering buffer zone was inconsistent with Secretary Schwab's recent determination . . . such practice is modified to be consistent with [Secretary Schwab's] Declaration and the [email adopting the Attorney General's opinion]."  (*Id.* at 3.)  Thus, after Secretary Schwab's Office adopted the Attorney General's opinion, defendant Metsker will no longer apply the electioneering statute to this non-electioneering conduct.[21]

*iv. Testimony and Declaration*

Plaintiffs further argue that Secretary Schwab's policies and guidance are expected to be followed and that he has binding or effective control over the discretionary policies of individual

---

[21]Defendant Metsker's previous practice under the electioneering statute applied to all election advocacy whether partisan or non-partisan, and is explained in part by a responsive e-mail attached to plaintiffs' complaint:

Please be advised that no signs of any nature may be posted on County property, nor within 250 feet from the voting entrance to any polling location in Johnson County. . . .  This is in compliance with [the electioneering statute].  "No Campaigning" signs will be posted by election workers as an indicator for your team of what is beyond the 250 feet.

(Doc. 1-4; *see* Doc. 1, at 10–11 (alleging restrictions on speech by defendant Metsker adopted pursuant to the electioneering statute).)

county election officers.  Plaintiffs base this argument both on defendant Metsker's actions and on the prior testimony of Bryan Caskey, Kansas Director of Elections.  Two exchanges by Mr. Caskey, made during the *Fish v. Kobach* litigation, are relevant here:

> Q.  . . . [I]f you've given an order do you sometimes confirm, yes, afterward the order was followed?
> A.  Yes, there are many, many times where myself or members of my staff will follow up with counties.  We have the ability to track certain activities within the ELVIS database on what they're doing and not doing.  And I consider that almost a routine part of my job is to follow up with counties and gauge their compliance with the directive or e-mails or conversations.

Hearing Tr. At 30:16–22, *Fish v. Kobach*, No. 16-02105-JAR (D. Kan. Mar. 30, 2018), ECF No. 516. ("*Hearing Tr.*").

> Q.  But if you identified an instance in which a county election official was not following the procedures of the Kansas Secretary of State's Office, you would notify that county election official that you believe they were not in compliance; correct?
> A.  Absolutely. That is correct.
> Q.  And you would expect the county election officials to comply with your instruction; correct?
> A.  Yes, I do expect them to do so.

Trial Tr. at 730:20–731:3, *Fish v. Kobach*, No. 16-02105-JAR (D. Kan. Mar. 30, 2018), ECF No. 507.

In the first exchange, Mr. Caskey is testifying in the context of election registration and administrative directives.  The second exchange follows a statement by Mr. Caskey that he has "no legal authority to force any county to do anything," but otherwise applies to efforts by Mr. Caskey to encourage compliance with Office policy and procedure.  *See id.* at 729–731.  Mr. Caskey's testimony on both occasions includes statements suggesting that the Office cannot compel compliance, but also that instructions and guidance are generally followed.[22]

---

[22] "If [county election officials] don't listen to what I say, I can't make them do anything . . . ." *Hearing Tr.* at 25:19–25:22; *id.* at 25:25–26:10 ("[W]hen I say something or when my predecessor said something, [the officials] generally follow that to the best of their ability. . . . But, again, you know, I can't force them to do anything.  I just tell them what the law is and that needs to be done.").

Secretary Schwab's Declaration to the court disclaims enforcement authority under the control statute:

> The election board of each polling place "controls" and is authorized to guide, manage, direct, and oversee the polling place to ensure that voting is conducted in an orderly manner.  The Kansas Secretary of State does not create or approve such election board policies, procedures or practices.  I don't have the authority to enforce the policies, procedures or practices election boards adopt.  My office will not attempt to enforce such policies, procedure or practices.

(Doc. 14-4, at 5.)

*v. Conclusions*

Here, plaintiffs do not show that Secretary Schwab has a demonstrated willingness to exercise enforcement pursuant to the control statute.  The complained-of discretion that gives rise to individual election officer policies is granted by statute and is not enforced by Secretary Schwab.  While plaintiffs argue that such discretion is unconstitutional *per se*, the Eleventh Amendment and the limits of *Ex parte Young* restrict the court's power to reach these arguments.

First, although plaintiffs allege that Secretary Schwab maintains an official policy allowing unlimited discretion to individual election officers, plaintiffs' closest support of this allegation is that the Election Manual provides an example of prior individual policies.  This falls short of showing the regulatory action, intent to act, or active and continued enablement of prospective unconstitutional policies.  The assumption that this example of prior individual practice is also an official policy permitting unlimited discretion, rather than an example of one prior individual practice adopted under the statute, is too great a leap.

Second, in the absence of an existing official policy or continuing violation, consistent with *Wagnon* and *Russell*, plaintiffs must show exercise of the Secretary's authority under the control statute in a way that either expands or reduces the validity of prospective individual policies.  Two candidates for this showing are the Office's prior regulation adopted pursuant to the control statute,

-23-

and the adoption of the Attorney General's opinion which led Defendant Metsker to change his practices.  The Office's regulation, however, deals with shift management and does not address prospective individual polling site policies.  Defendant Metsker's policy change, pursuant to the Office's e-mail, comes closer, but is not before the court as a policy either adopted or sustained under the control statute.

Plaintiffs allege that Defendant Metsker maintained and applied his previous policy under the electioneering statute.  (Doc. 1, at 2, 3, 5, 7, 10, 20.)  Plaintiffs further allege that other parties, not before the court, maintain other policies pursuant to the control statute.  (*Id.* at 12.)  Defendant Metsker's letter states that his previous policy was in compliance with the electioneering statute and directly cites the electioneering provision (Doc. 1-4.), and defendant Metsker's Declaration refers to his practice as an administration of the non-electioneering buffer zone.  To construe these changes as pursuant to the control statute, rather than an understanding of the electioneering statute, would be contrary to the filings of all parties.  For reasons discussed in the court's electioneering analysis, this change in understanding of the electioneering statute is within permissible interpretation and does not yet show a willingness to enforce the challenged provisions.  Any potential showing that defendant Metsker's practice was not an anti-electioneering policy adopted and changed pursuant to the electioneering statute is further frustrated by the opinion's disavowal that "[t]he extent to which the state or a local election board may restrict non-partisan speech in or around a polling place is beyond the scope of this opinion."  (Doc. 18-1, at 8.)

Third, plaintiffs' arguments based on Mr. Caskey's testimony face similar difficulties.  While Mr. Caskey's testimony shows that the Office has some power to encourage compliance with policies related to voter registration and general election management, he disclaimed actual power to compel action even in that capacity, and the context of his testimony does not necessarily transfer to the

handling and discretion of individual polling site policies under the control statute.  Whether plaintiffs found the contradicting portions of Mr. Caskey's testimony unpersuasive or merely found it unnecessary to delineate between the context of *Fish* and the instant discretion-based challenge, the court is not persuaded that this potential power also imputes a willingness to enforce individual election site policies under the control statute.

Plaintiffs' allegations regarding an official policy improperly transform Secretary Schwab's inaction into an affirmative exercise of enforcement power.  But *Wagnon*, *Kitchen*, *Cressman*, *Fish*, *Russell* and *Carnahan* are all clear that a willingness to enforce a challenged provision comes from either action or clear intent.  While this action need not be through an official enactment, the combined absence of both action and intention does not show a willingness to exercise enforcement.  Although plaintiffs have shown a way that Secretary Schwab may have the power to cause alteration of individual control-based policies, this is not the same as showing that Secretary Schwab is willing to exercise that power to influence these policies.  This showing—power coupled with action—is what guards against the dangers recognized by the Supreme Court in *Ex parte Young*.  "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."  *Ex parte Young*, 209 U.S. at 157.

The *Ex parte Young* exception allows the court to enjoin unconstitutional official action, taken pursuant to law or otherwise, by preventing the application of sovereign immunity.  The exception cannot be sustained on official power and general supervisory duties alone.  Allowing plaintiffs' challenge to proceed, without a sufficient showing that Secretary Schwab is willing to exercise his allegedly unconstitutional enforcement powers, improperly makes the state a party to the suit.

Although Secretary Schwab may be an efficient defendant for plaintiffs' desired relief, plaintiffs have not yet shown an action by the Secretary or his Office that prevents the application of Eleventh Amendment immunity.

Pursuant to Federal Rule of Civil Procedure 12(b)(1), because plaintiffs have not shown an exception to the application of sovereign immunity to Secretary Schwab, the court lacks subject matter jurisdiction over plaintiffs' claims against him, and defendant's motion to dismiss is granted.  Because the court lacks subject matter jurisdiction over plaintiffs' claims against Secretary Schwab, plaintiffs' motion for a preliminary injunction is denied, and plaintiffs' motion for a decision on the existing record is denied as moot.


**IT IS THEREFORE ORDERED** that defendant's Motion to Dismiss for Lack of Jurisdiction (Doc. 13) is granted.

**IT IS FURTHER ORDERED** that plaintiffs' Motion for Preliminary Injunction (Doc. 3) is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion for Hearing or Decision on the Existing Record (Doc. 25) is denied as moot.

Dated this 26th day of September, 2019, at Kansas City, Kansas.

**s/ Carlos Murguia          **
**CARLOS MURGUIA**
**United States District Judge**